# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

IN RE:                          *        CHAPTER 13
EARL M. BARNHART,               *
        Debtor          *        CASE NO. 1:07-bk-02308MDF
                                *
ROBERT C. BOYCE,                *        Re: Motion to Dismiss Case
        Movant          *
                                *
    vs.                        *
                                *
EARL M. BARNHART,               *
        Respondent      *

## OPINION

Before me is the motion of Robert C. Boyce ( "Boyce") to dismiss Debtor's Chapter 13 case, alleging that the petition was not filed in good faith and should be dismissed pursuant to 11 U.S.C. § 1307(c). Earl M. Barnhart ("Barnhart" or "Debtor") filed an answer to the motion, denying the allegations and asserting that the petition was filed in good faith. Following an extensive discovery process, an evidentiary hearing was held over the course of two days: December 11, 2008 and February 19, 2009. Post-hearing briefs were submitted by the parties, and the matter is ripe for decision.[1] For the reasons set forth below, I find that Debtor did not file his petition in good faith. Accordingly, the case will be dismissed.

## I. Procedural and Factual History

In 2001, Barnhart and Boyce entered into a racehorse breeding and training partnership. The partnership disintegrated, and in 2004 Boyce filed a complaint for breach of contract against Barnhart in the Pennsylvania Court of Common Pleas, Cumberland County, to which Barnhart

---

[1] I have jurisdiction pursuant to 28 U.S.C. §§157 and 1334. This matter is core pursuant to 28 U.S.C. §157(b)(2)(A) and (O). This Opinion and Order constitute findings of fact and conclusion of law made pursuant to Federal Rule of Bankruptcy Procedure ("FRBP") 7052, which is applicable to contested matters pursuant to FRBP 9014.

filed a counterclaim (the "State Court Litigation"). The matter was tried before a jury, and a verdict was entered in favor of Boyce and against Debtor on November 8, 2006. Judgment on the verdict was entered on May 16, 2007 in the amount of $74,000.00, plus interest from November 8, 2006 and court costs. On June 6, 2007, Debtor filed an appeal with the Superior Court of Pennsylvania. On June 18, 2007, he filed an application for supersedeas but did not post security with the application.[2] The application was denied on July 24, 2007. Debtor filed the instant petition three days later and submitted a plan of reorganization on October 5, 2007.[3] Boyce filed a Motion to Dismiss Debtor's case on October 2, 2007, which he subsequently amended. Debtor responded with an answer and amended answer.

Debtor is seventy-six years of age and continues to maintain a dental practice in Carlisle, Pennsylvania. Debtor's practice is operated from a building located at 800 Belvedere Street in Carlisle, which is owned by a closely-held corporation, REG, Inc. ("REG"). In his schedules, Debtor states that he owns 40% of the shares of REG valued at $85,000.00. At the hearing on Boyce's motion, Debtor testified that he and his wife, Louanne Barnhart ("Louanne") jointly own 80% of the REG shares and their son owns the remaining 20% of the shares. The 2005 and 2006 federal income tax returns for Debtor and his wife state that Debtor owns 100% of the REG shares, and the 2007 return states that he owns 40% of the shares.[4]

---

[2]Between the first and second hearing dates on this matter, the Superior Court affirmed the decision in favor of Boyce. Debtor filed a Petition for Allowance of Appeal with the Pennsylvania Supreme Court, which was denied on July 22, 2009.

[3]Boyce has objected to confirmation of Debtor's Chapter 13 Plan.

[4]Between the two hearing dates in this matter, I granted Boyce's motion to exclude the purported share ledger and share certificates of REG based upon Debtor's failure to provide these documents to Boyce in accordance with a discovery request.

2

In addition to his dental practice, Debtor trained and raced thoroughbred horses for approximately forty years. On his schedules, Debtor listed an ownership interest in six racehorses with a total value of $10,000.00, including a horse named Dynamic One, which was valued at $5,000.00. On May 13, 2007, Debtor gave a horse named Loves Me Diamond to Louanne for her birthday. According to Debtor and Louanne, title was not transferred – the "gift" only provided Louanne with the opportunity to use her separate funds to train and race the horse. Loves Me Diamond was sold for $3,400.00 on an unspecified date in 2007, and the proceeds were deposited in a joint bank account held by Debtor and Louanne. The transfer of Loves Me Diamond is disclosed in Debtor's Statement of Financial Affairs, with the value of the horse being listed at $3,420.00.

Louanne also provided funds to train Dynamic One, owned by Debtor, which was later sold for $150.00. No funds were received by Debtor in this transaction, but were retained by the broker for costs incurred. Neither Debtor nor his wife were able to specify when this transaction took place. The only other significant assets reported on Debtor's schedules are his home, valued at $244,100.00, which he owns jointly with his wife, and the counterclaim in the State Court Litigation.

Debtor testified that he does not have retirement savings, such as a 401k, or other investments. According to Debtor's schedules, his home is valued at $244,100.00 and is subject to a mortgage of $225,009.15. Debtor lists the value of his 40% interest in REG at $85,000.00. Testimony at the hearing demonstrated that the tax assessed value of the real estate owned by

3

REG, its only asset, is $294,730.00. This real estate is subject to a mortgage of $80,000.00. Therefore, there is substantial equity in the property.[5]

Debtor lists only one secured claim – the mortgage on the home that he owns jointly with his wife – and no priority, unsecured claims. On Schedule F, Debtor lists six credit cards with amounts due totaling $95,010.00. The remaining claims are: a disputed claim of $8,496.40 owed to Debtor's counsel in the State Court Litigation; a contingent claim of $88,288.00 owed to Orrstown Bank on a loan made to REG; and Boyce's $74,000.00 judgment, listed as subject to setoff and disputed.

Debtor's Statement of Financial Affairs reflects income from employment or operation of business in 2005 of $144,824.00: $69,978.00 from Debtor's dental practice and $74,846.00 from horse racing. Debtor's income for 2006 is listed as $176,067.00: $64,916.00 from the dental practice and $111,151.00 from horse racing. From the beginning of 2007 through October 5, 2007 when the Statement of Financial Affairs was filed, Debtor's income was $66,484.00: $30,986.00 from his dental practice and $35,498.00 from horse racing. Debtor testified that between July 2007 and December 31, 2007 he had no net income from horse racing.

In order to finance the State Court Litigation, Debtor obtained cash advances on credit cards of approximately $90,000.00. He testified that he was running out of funds and that "[he] could see a [financial] thunderstorm coming in the distance." (N.T. 179 – 12/11/08.) Notwithstanding his rising debt, at the time he filed his petition Debtor was current on all of his

---

[5]As discussed further below, although it is clear from the record that REG is a closely held corporation owned at least partially by Debtor, it is unclear whether Debtor owns all of the shares in his sole name or owns the shares jointly with his wife or with his wife and son.

4

expenses. Most of Debtor's unsecured debt (other than his contingent liability to Orrstown Bank) is attributable to expenses incurred by Debtor in defending the State Court Litigation.

## II. **Discussion**

On request of a party in interest, a Chapter 13 bankruptcy case may be dismissed "for cause." 11 U.S.C. § 1307(c)[6]. Boyce asserts that Debtor's case should be dismissed because it was not filed in good faith. Although "good faith" is not explicitly mentioned in the Bankruptcy Code, the Third Circuit has recognized the absence of good faith or the presence of bad faith as grounds for dismissal. *In re Lilley*, 91 F.3d 491 (3d Cir. 1996).

"[G]ood faith is a term incapable of precise definition. . . . [T]he good faith inquiry is a fact intensive determination better left to the discretion of the bankruptcy court. [T]herefore . . . the good faith of Chapter 13 filings must be assessed on a case-by-case basis in light of the totality of the circumstances." *Lilley*, 91 F.3d at 496 (internal citations omitted). The "totality of the circumstances" test comprises a nonexclusive list of factors. Under *Lilley*, relevant factors may include, but are not limited to:

(1)     the nature of the debt;
(2)     the timing of the petition;
(3)     how the debt arose;
(4)     the debtor's motivation in filing his petition;
(5)     how the debtor's actions affected creditors;
(6)     the debtor's treatment of creditors both before and after the petition was filed; and

---

[6] 11 U.S.C. § 1307(c) Except as provided in subsection (e) of this section [regarding unfiled tax returns], on request of a party in interest or the United States trustee and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 7 of this title, or may dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause, including— (1) unreasonable delay by the debtor that is prejudicial to creditors . . . or (11) failure of the debtor to pay any domestic support obligation that first becomes payable after the date of the filing of the petition.

5

(7)     whether the debtors has been forthcoming with the bankruptcy court and the creditors.

*Id.* (citations omitted).  In order to ascertain whether, under the totality of the circumstances, Debtor's petition was filed in good faith, the Court must apply the *Lilley* factors to the facts submitted in evidence.  *In re Goddard*, 212 B.R. 233, 238 (D. N.J. 1997).

"A creditor who challenges the debtor's filing bears the initial burden to put the debtor's good faith into dispute. . . . The burden of persuasion then shifts to the debtor, who must offer evidence showing that the bankruptcy process is not being misused."  *In re LeGree*, 285 B.R. 615, 618 (Bankr. E.D. Pa. 2002); see also *In re Barr*, 263 B.R. 496, 498 (Bankr. E.D. Pa. 2001).  A debtor must meet this burden of proof by a "preponderance of the evidence."  *In re Weisser*, 190 B.R. 453, 454 (Bankr. M.D. Fla. 1995); *In re Ziegler*, 88 B.R. 67, 69 (Bankr. E.D. Pa. 1988).

The Court's initial step is to determine whether Boyce, as the moving party, has met his burden of placing Debtor's good faith in dispute.  Boyce alleges that Debtor used this bankruptcy filing as a substitute for obtaining a supersedeas in the State Court Litigation.  Boyce also argues that alleged errors and omissions in Debtor's schedules and statements and Debtor's failure to timely produce documents relevant to his bankruptcy case evidence a lack of good faith.

Some courts have held that filing a bankruptcy case to invoke the automatic stay rather than obtaining a supersedeas by posting a bond during appeal conclusively establishes bad faith. *See In re Marsh*, 36 F.3d 825 (9th Cir. 1994); *In re Little Creek Development Co.*, 779 F.2d 1068 (5th Cir. 1986). The Third Circuit, however, has not held that filing for bankruptcy while pursuing the appeal of a state court judgment requires a finding of bad faith. *In re Myers*, 491 F.3d 120, 125 (3d Cir. 2007).  The Court of Appeals has held, however, that "suspicious timing

6

of a bankruptcy petition is an appropriate factor for a court to consider in the bad faith analysis." *Id.*

Debtor filed the instant petition three days after the Court of Common Pleas denied his request for a supersedeas without posting a bond. The timing of Debtor's petition raises questions regarding Debtor's motivation for filing, especially given the fact that Debtor was current with regular payments to all undisputed creditors on the filing date. In addition, Boyce demonstrated that Debtor failed to include his dental practice as an asset on his schedules and that Debtor's representations of his interest in REG were inconsistent. "Once a party calls into question a petitioner's good faith, the burden shifts to the petitioner to prove his good faith." *In re Tamecki*, 229 F.3d 205, 207 (3d Cir. 2000). As such, I find that Boyce met the initial burden of putting Debtor's good faith into issue. Debtor, therefore, assumed the burden of convincing the Court that his petition was filed in good faith under the test articulated by the Third Circuit in *Lilley*.

### A. *The nature of the debt/how the debt arose*

Boyce asserts that Debtor's actions in the State Court Litigation – his defense against Boyce's claim, his assertion of a counterclaim, and his appeal of the state court judgment – were conducted in bad faith. Because the debts related to the State Court Litigation were incurred in bad faith, Boyce argues, Debtor's resultant bankruptcy petition was filed in bad faith. I do not find Boyce's argument persuasive. Being subject to an adverse judgment and choosing to lodge an appeal does not conclusively establish bad faith. Further, debtors often include in their petition debts related to unsuccessful litigation. It is not uncommon for the cost of litigation to cause financial stress, with an adverse judgment being the final straw. If Debtor's conduct in the State

7

Court Litigation were the only evidence of bad faith proffered by Boyce, this would not form an adequate basis upon which to dismiss the petition.

    B.  *The timing of the petition/Debtor's motivation for seeking bankruptcy protection*

Boyce alleges that the filing of the petition only three days after the Court of Common Pleas denied Debtor's application for a supersedeas without bond indicates that Debtor is using the automatic stay as a substitute for posting a bond. The Court agrees. As discussed above, however, this action alone does not constitute bad faith, but must be considered in the totality of the circumstances.

Implicit in Boyce's argument is the assumption that Debtor would have been able to obtain a bond, but was unwilling to do so. Therefore, it was inappropriate for Debtor to use the bankruptcy system when he could have posted a bond. Debtor testified that he assumed that he could not acquire a bond unless his wife also executed the bond and provided supporting financial information. Evidence presented at the hearing on this matter indicates that because Debtor's trial counsel in the State Court Litigation understood that the majority of Debtor's assets were owned jointly with his wife, counsel directed both Debtor and his wife to complete the bond application. Whether Louanne's participation was in fact necessary or not, I find to be credible Debtor's testimony that this was his belief at the time. Louanne testified that she was asked to sign the application for the bond and refused to do so, stating that if she signed it, "I would be putting everything that I owned at risk, REG and my home. I wasn't about to do that. . . . I was not going to sign away all my assets." (N.T. 34, 55 – 2/19/09.) Given Louanne's refusal to pledge assets in which she held an interest to secure a bond and Debtor's belief that his wife's

8

participation was necessary for him to qualify for the bond, I do not find Debtor's failure to obtain a supercedeas bond, rather than filing for bankruptcy, as an action taken in bad faith.

The Court concludes that Debtor filed for bankruptcy to invoke the automatic stay because he expected the Superior Court to reverse the Court of Common Pleas, thus vindicating his defense of Boyce's suit. Under Debtor's reasoning, once Boyce's judgment was set aside, he could confirm his plan that proposed to pay unsecured creditors in full. Although he attempted to establish that he was in need of bankruptcy relief generally, most of his prepetition debt was attributable to costs incurred in the litigation. Household and business expenses were being paid as they became due. Even after the filing of the petition, no evidence was presented that Debtor was experiencing any difficulty paying his household expenses while making monthly plan payments of $1,741.85.

A debtor is entitled to seek bankruptcy relief in order to obtain a breathing spell from the collection activities of creditors and to enable him to reorganize his affairs in an orderly fashion. Even if Barnhart had possessed the ability to post a bond, it would have been appropriate for him to file bankruptcy for the purpose of reorganizing his affairs. However, I conclude that Debtor's case was not filed to reorganize his financial affairs, but to frustrate the collection efforts of one creditor – Boyce.

C.  *Debtor's treatment of creditors both before and after the petition was filed*

1.  *Lack of payments to Boyce pre-petition*

Debtor's Statement of Financial Affairs reflects that he made regular payments to most of his creditors until he filed his petition. Schedule F lists Boyce as having a disputed claim against Debtor for $74,000.00, subject to setoff, based on the judgment entered in the State Court

9

Litigation. Debtor testified that he did not pay Boyce any amounts toward the judgment pre-petition because the judgment was under appeal. I do not find Debtor's failure to pay Boyce while an appeal was pending an indicator of bad faith.

2. *Alleged pre-petition transfers to spouse*

The most serious allegations made in support of the Motion to Dismiss are the transfers by Debtor to his wife of two thoroughbred racehorses, Loves Me Diamond and Dynamic One. The testimony of Debtor and his wife was confusing and contradictory on this issue. Debtor asserted that both animals had been transferred to his wife, while Louanne, who seemed to have a better recollection of events, stated that only Loves Me Diamond had been transferred. Boyce argued that these transfers were not properly listed on Debtor's schedules and were done for the purpose of protecting these assets from creditors.

Debtor's Statement of Financial Affairs reflects a gift to Debtor's wife on May 13, 2007 of Loves Me Diamond, with a listed value of $3,420.00. Louanne testified that "he [the Debtor] gave [Loves Me Diamond] to me as a birthday present. We kind of laughed about that. I would have the right to finance the racing of that horse, and he still owned it . . . ." (N.T. 44 – 2/19/09.) Louanne testified that she contributed approximately $3,600.00 toward the maintenance of Loves Me Diamond, which was later sold for approximately $3,400.00. Louanne testified that she thought that the sale occurred prior to the petition date of July 27, 2007, but was unsure of the precise date. The proceeds of the sale were deposited in the joint bank account of Debtor and his wife.

While Debtor and Louanne attempted to portray the transfer of the horse as a casual transaction, the timing is suspicious. The transfer occurred after the jury verdict was entered on

10

November 8, 2006 and three days before the Court of Common Pleas entered judgment against Debtor. I find that Debtor's transfer of Loves Me Diamond to his wife and the subsequent transfer of the proceeds of the sale to a joint bank account to be fraudulent as to Boyce and indicative of bad faith.

Dynamic One, the other horse Boyce alleges was transferred by Debtor to his wife, is listed on Schedule B as Debtor's personal property with a value of $5,000.00. At an examination under Rule 2004 conducted before trial, contrary to the information in his schedules, Debtor stated that he transferred Dynamic One to his wife in March 2007, again after the jury had rendered a verdict in favor of Boyce. Louanne, however, testified that no such transfer occurred and that Debtor retained ownership until Dynamic One was sold for $150.00. [7] Although she characterized the transaction as a "sale," she explained that Debtor did not receive any funds from the transfer. She stated that "the person that handled the sale of that horse kept that money" and that "the money was put back into the room and the board, and the things that it had acquired." (N.T. 67 - 2/19/09.) The record does not indicate a date upon which this transaction occurred. The testimony of Debtor and Louanne failed to explain satisfactorily why a horse valued at $5,000.00 was sold for $150.00.

Debtor and Louanne attempted to justify the transfers alleging that Louanne became involved in the horse racing business in May 2007 when she began contributing her personal funds to train and care for Loves Me Diamond and Dynamic One. I do not find the testimony of

---

[7]Debtor was confused about the ownership of Dynamic One, while Debtor's wife was firm that the horse was owned by her husband. (N.T. 62-68 – 2/19/09)

11

either Debtor or Louanne to be credible on this issue, and I conclude that they were attempting to place assets outside of the reach of future collection efforts by Boyce.

    D. *Whether Debtor has been forthcoming with the bankruptcy court and creditors*

        1. *Ownership of REG, Inc.*

On Schedule B – Personal Property, Debtor listed his interest in REG[8] as "40% shares of common stock in closely-held PA corporation," with a value of $85,000.00. Debtor testified that this was based on his recollection of the formation of the corporation in the fall of 1964. (N.T. 129 – 12/11/08.) Debtor testified that this information was "fished out of memory" but that he also "had no idea how it [REG] was set up . . ." (N.T. 129 – 12/11/08.)

The federal tax returns filed on behalf of REG in the years immediately prior to Debtor's petition contradict the information provided on Schedule B. The 2005 and 2006 1120S federal tax returns list Debtor as owning 100% of the corporation's stock.[9] REG's 1120S tax return for

---

[8]REG was formed in October 1964 by Debtor and two other individuals as a vehicle to own a commercial building out of which the shareholders operated their businesses, in Debtor's case, his dental practice. (N.T. 131 – 2/19/09.) In May 1981, Debtor bought out the other shareholders, with Louanne named as Debtor's nominee. (N.T. 133 – 2/19/09.) As noted above, there was conflicting evidence offered on Debtor's ownership interest in REG.

[9]Debtor testified that prior to 2005 he asked his accountants whether this designation was correct because he understood that he and his wife had purchased the corporation together. Debtor stated that his accountants advised him that listing him as a 100% owner was accurate because he and his wife are considered "one entity." (N.T. 137 – 12/11/08.) Debtor further testified that when the accountants he used for the 2005 tax returns questioned him about this description of his interest, he informed them of the advice given by his prior accountants, and the current accountants advised him that the description did not need to be changed. (N.T. 138, 140 – 12/11/08.) Debtor testified that at the time of the evidentiary hearing in this matter, he had not amended his 2005 or 2006 federal income tax returns. (N.T. 164 – 2/19/09.)

2007, which was filed after Debtor's bankruptcy petition was filed, lists Debtor as owning 40% and Debtor's wife as owning 40%.

Evidence of the ownership of the shares in REG was the subject of several discovery hearings conducted by this Court in preparation for the hearing on the Motion to Dismiss. On November 3, 2008, this Court issued an order that, *inter alia*, directed each party to file and serve upon the opposing party a short statement, including a list of all witnesses and a list of all exhibits to be offered into evidence. Both parties submitted the required statements. The day before the first hearing in this matter, December 10, 2008, Debtor's counsel informed Boyce and the Court that he had just been provided with a share ledger for REG and accompanying stock certificates, which purported to show that Debtor and his wife owned 80% of the shares of REG as joint tenants with rights of survivorship. Debtor knew of the location of the documents more than two months prior to trial. Based upon the untimely appearance of these documents, Debtor was barred from presenting these items as exhibits at the hearing on this matter.

### a. *Debtor's failure to locate and provide documents*

Debtor testified that he located documents regarding his ownership interest in REG in about September or October of 2008. He admitted that he turned the documents over to his wife, who transferred them to her attorney and to Debtor's counsel for the State Court Litigation appeal. However, these documents were not provided immediately to Debtor's bankruptcy counsel. Debtor testified that he provided the documents to his wife and then to her counsel because of Debtor's concerns that "the building was being threatened" and, therefore, Louanne's counsel should review them. (N.T. 162- 12/11/09.)

13

Even if I accept his explanation, Debtor was clearly uncertain of his ownership interest in REG when his bankruptcy schedules were filed in 2007. I find Debtor's delay in locating documents that would have clarified his ownership interest in REG and, more grievously, Debtor's delay in providing such documents to his bankruptcy counsel, to be strong evidence of bad faith. It was Debtor's responsibility to locate records related to REG prior to filing his bankruptcy schedules. That such documents were apparently located in Debtor's residence more than a year after filing of the petition indicates to me that Debtor did not take seriously his duty to timely, thoroughly and accurately complete his bankruptcy schedules and statements. Debtor had to have understood that the ownership of the REG shares was a legitimate area of inquiry by Boyce. Debtor was well aware that his recollection of the ownership of the corporation was in conflict with the information included in his filed tax returns. Debtor's cavalier treatment of information vital to the determination of Debtor's assets is unacceptable and indicative of bad faith.

### b. *Debtor's failure to amend schedules*

Debtor testified at the hearing that he believed that the information he provided on his schedules regarding the ownership of REG was incorrect. He stated that he believed that he owned 80% of the company with his wife as tenants in common, the remaining 20% being owned by their son. Debtor testified that his new understanding of his ownership interest in REG is based on documents found after his petition was filed. Debtor's bankruptcy counsel stated

14

during the hearing on February 19, 2009 that he disagrees with Debtor's understanding of his ownership of REG and has advised Debtor not to amend his schedules.[10]

Debtor's confusion about his ownership interest in REG is not by itself an indicia of bad faith. It is not unusual for a layperson to be unclear about the legal intricacies of forms of ownership. I do find that Debtor's failure to consult with his attorney in a timely manner so that he could amend his schedules to accurately reflect his ownership interest in REG as evidence of bad faith.

### 2. *Failure to list all creditors and assets on schedules*

Debtor admitted to failing to include a creditor on his bankruptcy schedules – a stable owner who boarded some of Debtor's horses and to whom Debtor owed approximately $6,000.00. Debtor testified that he knew he owed money to this creditor at the time he filed his petition, but did not include her on the schedules because "[he] hope[s] to catch up with her." (N.T. 87 – 2/19/09.) Debtor later testified that this creditor was probably omitted from his schedules because he either had not received the bill for her services or had misplaced the bill at the time the petition was filed. (N.T. 165 – 2/19/09.) Debtor's explanations are disingenuous. This was clearly a pre-petition debt that should have been listed on Debtor's schedules. Again, Debtor's attempt to play fast and loose with the requirements of the Bankruptcy Code suggest that he is not proceeding in good faith. Debtor's testimony that he omitted this credit because of his desire to "catch up with her" suggests that he intends to satisfy this claim outside of the

---

[10]The disagreement between Debtor and his counsel is on the issue of whether the certificates state that Debtor owns the stock with his wife as tenants in common or as joint tenants with the right of survivorship. Because the share certificates were not admitted into evidence, the precise ownership interest has not been established.

15

bankruptcy proceeding. Although he certainly is entitled to pay a discharged debt, his listing of certain creditors in his schedules while omitting preferred creditors is indicative of bad faith.

Debtor's failure to list his dental practice as an asset on his schedules is also an indicator of bad faith. Debtor credibly testified that his practice has little or no net value and no evidence to the contrary was presented. But "even if the debtor thinks the assets are worthless he must nonetheless make full disclosure (citation omitted). . . . Indeed, the debtor has no discretion – the schedules are to be complete, thorough and accurate in order that creditors may judge *for themselves* the nature of the debtor's estate." *In re Lunday,* 100 B.R. 502, 508 (Bankr. D. N.D. 1989) *cited in In re Craig*, 195 B.R. 443, 451 (Bankr. D. N.D. 1996)(emphasis in the original).

### III.  Conclusion

In order to make a determination in this case, I must assign weight to the various factors that argue for and against Debtor's good faith and balance them against each other. Debtor's transfer of assets after the verdict was rendered in the State Court Litigation, the failure to adequately disclose his assets and liabilities, the timing of the bankruptcy petition, and the failure to demonstrate a need for bankruptcy relief all support a finding of bad faith. Therefore, based upon my examination of the totality of the circumstance, I find that Debtor's petition was not filed in good faith and should be dismissed. An appropriate order follows.

**By the Court,**

*Mary D France*
Chief Bankruptcy Judge

Date: January 5, 2010

*This document is electronically signed and filed on the same date.*